[No. F015335. Fifth Dist. July 20, 1993.]

THE PEOPLE, Plaintiff and Respondent, v.
FELIPE EVANGELISTA SIXTO, Defendant and Appellant.

**[Opinion certified for partial publication.†]**

†Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of the Statement of Facts and parts II through VIII.

## Counsel

Alisa M. Weisman, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Robert R. Anderson, Assistant Attorney General, and Edgar A. Kerry, Deputy Attorney General, for Plaintiff and Respondent.

## Opinion

**BUCKLEY, J.**—Appellant Felipe Evangelista Sixto was sentenced to die for the capital murder of five-year-old Jorge Garza. His convictions were overturned due to the ineffectiveness of his trial attorneys. Upon retrial, with representation by new counsel, he was again convicted but sentenced to life imprisonment without the possibility of parole. In the published portion of this opinion, we will consider the trial court's obligation, upon retrial, to undertake curative measures designed to remedy the effect of the deficient performance of original counsel.

### Procedural History

On July 22, 1981, an information was filed in Kern County Superior Court charging Sixto with murder (Pen. Code, § 187),[1] forcible commission of a lewd and lascivious act on a child under the age of 14 years (§ 288, subd. (b)), and forcible sodomy on a child under the age of 14 years and more than 10 years younger than the defendant (§ 286, subd. (c)). Two special circumstances were alleged: the murder was committed while Sixto was engaged in or was an accomplice in the attempted commission of sodomy (§ 190.2, subd. (a)(17)(iv)), and the murder was committed while Sixto was engaged in or was an accomplice in the attempted commission of a lewd and lascivious act upon a child under the age of 14 (§ 190.2, subd. (a)(17)(v)).

A jury convicted Sixto as charged and found the special circumstance allegations to be true. Punishment was fixed at death. (*In re Sixto* (1989) 48

---

[1] All statutory references are to the Penal Code unless otherwise indicated.

Cal.3d 1247, 1252, 1256 [259 Cal.Rptr. 491, 774 P.2d 164].) Following habeas corpus proceedings, the California Supreme Court reversed the convictions on the ground that Sixto received ineffective assistance of counsel at the guilt phase of trial. (*Id.* at p. 1252.)

Following remand to the Kern County Superior Court, new defense counsel were appointed. These attorneys filed a multitude of motions, which will be described as they become relevant to issues raised on appeal.

On September 17, 1990, an amended information was filed. In it, Sixto was charged with murder (§ 187); commission of a lewd and lascivious act on a child under the age of 14 years (§ 288, subd. (a)); and sodomy by means of force or fear, or on a child under the age of 14 years and more than 10 years younger than the defendant (§ 286, subd. (c)). Two special circumstances were alleged: the murder was committed while Sixto was engaged in the commission or attempted commission of sodomy (§ 190.2, subd. (a)(17)(iv)), and the murder was committed while Sixto was engaged in the commission of a lewd and lascivious act on a child under the age of 14 (§ 190.2, subd. (a)(17)(v)). Sixto was arraigned and pleaded not guilty.

Jury selection began on September 18, 1990. Following the guilt phase of trial, the jury convicted Sixto of first degree murder and the remaining counts, and found both special circumstances to be true. At the penalty phase, the jury set the appropriate punishment at life in prison without the possibility of parole, to which Sixto was later sentenced.

STATEMENT OF FACTS*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

DISCUSSION

I. *Trial Court's Refusal to Adopt Curative Measures*

A. *Introduction*

Sixto contends he was denied his rights, under the state and federal Constitutions, to due process of law and to the effective assistance of counsel upon retrial. He claims these deprivations resulted from the trial court's refusal to remedy the failure of his original attorneys—Eugene Lorenz and Robert Cook—to conduct essential scientific tests in connection with Sixto's diminished capacity defense. Sixto specifically refers to the failure of

*See footnote, *ante*, page 374.

Lorenz and Cook to have his blood sample tested for alcohol and to pursue recommended additional phencyclidine (PCP) testing. These failures led the California Supreme Court to vacate Sixto's original convictions on the ground of ineffectiveness of counsel. (See generally *In re Sixto, supra,* 48 Cal.3d 1247.)[4]

■ Some preliminary observations are in order. First and foremost, in reality this issue is not one of deficient performance of counsel, but of perceived trial court error. Accordingly, it should not be analyzed under the rubric of ineffective assistance of counsel. A trial court's rulings, even if erroneous, do not cause an attorney to perform in a deficient manner, nor do they deny a defendant his or her right to the effective assistance of counsel. An attorney trying a case must work within the parameters established by the trial court's rulings. If, because of those rulings, counsel is unable to provide the level of assistance or strength of defense that might otherwise have been provided, the fault (if any) lies with the court, not counsel.

Similarly, a defendant is not denied the effective assistance of retrial counsel by the deficient performance of his original attorneys. While the omissions of original counsel may detrimentally affect the case new counsel is able to present, new counsel is not thereby rendered ineffective, and the defendant is not denied the effective assistance of counsel upon retrial.

That an ineffectiveness-of-counsel analysis is inappropriate to the issue at hand is shown by the law on the subject. ■ Briefly stated, in order to establish such a claim, "a defendant must show that counsel (1) performed at a level below an objective standard of reasonableness under prevailing professional norms; and thereby (2) subjected the defense to prejudice, i.e., in the absence of counsel's failings a more favorable outcome was reasonably probable." (*People* v. *Hamilton* (1988) 45 Cal.3d 351, 377 [247 Cal.Rptr. 31, 753 P.2d 1109]; see also *In re Sixto, supra,* 48 Cal.3d at p. 1257 [to establish ineffectiveness of counsel under state Constitution, defendant must prove counsel failed to make particular investigations and omissions resulted in denial or inadequate presentation of potentially meritorious defense].)

■ Sixto has failed to point out a single instance in which retrial counsel (Louis S. Katz and Stanley Simrin) "performed at a level below an

---

[4]The Supreme Court also found Lorenz and Cook deficient for failing to have the tapes of Sixto's interrogations transcribed and translated in a timely manner, and for failing to present evidence of the PCP testing that had been done. (*In re Sixto, supra,* 48 Cal.3d at p. 1264.) Those omissions are not relevant to the instant appeal, as counsel had the benefit of the translated interrogations and presented the evidence that was available concerning PCP testing.

objective standard of reasonableness under prevailing professional norms." (Cf. *People* v. *Hamilton*, *supra*, 45 Cal.3d at p. 377.) Counsel made a concerted effort to present a defense and to overcome the evidentiary problems caused by the failings of Lorenz and Cook. Counsel also vociferously sought various curative measures to remedy the situation caused by Lorenz and Cook, as well as the unavailability of the blood sample for retesting. Problems which Katz and Simrin did not cause and which were not within their power to remedy—despite their best efforts—should not be laid at their doorstep.

Second, Sixto received relief from the prejudicially deficient performances of Lorenz and Cook: the California Supreme Court vacated his original convictions and remanded the matter for a new trial. (*In re Sixto*, *supra*, 48 Cal.3d at p. 1265.) However, this does not necessarily mean Sixto received all the relief to which he was entitled. In many cases, no doubt, the granting of a new trial is sufficient to remedy the prejudice caused by an attorney's deficient performance and nothing further need be done in this regard. But the fact remains that every defendant in a criminal case has the right to a fair trial, be it an initial proceeding or a retrial. If reversal and the granting of a new trial are insufficient to ensure a fair trial upon remand, further relief should be granted.[5]

That said, Sixto's claim is more accurately one that the trial court erroneously refused to take steps to rectify counsel's inability to make up for the deficient performances of Lorenz and Cook. We must therefore determine whether the trial court properly refused to implement the curative measures requested by defense counsel, and whether by so doing it denied Sixto his right to a fair trial or his due process right to have the opportunity to present a complete defense. In order to answer these questions, it is necessary first to examine in detail the history of this case and the Supreme Court's ruling in the writ proceeding.

B. *Factual and Procedural Background*

1. *Evidence Presented at First Trial*

The record of Sixto's first trial is not before this court. However, the evidence presented there is summarized in the California Supreme Court's opinion. In pertinent part, the evidence at the first trial showed that Sixto and

---

[5]Under the circumstances of the instant case, we need not determine whether a trial court has a sua sponte duty to fashion curative measures, and if so, what those measures might be. Each case will be particularly dependent upon its own facts. Here, Sixto does not point to any curative measures the trial court might have imposed which were not requested by defense counsel.

several other farmworkers attended a barbecue at the home of Jorge's grandfather on June 6, 1981. Sixto and his family lived next door. Jorge came in and out of the party several times. His body was found that night in a vineyard across the street. Physical evidence pointed to Sixto. A "substantial" amount of beer and food was consumed by those at the barbecue on June 6. (*In re Sixto, supra*, 48 Cal.3d at pp. 1252-1253.) Tests by Western Laboratories of the blood drawn from Sixto on June 7, following his arrest, revealed no evidence of PCP or other drugs. The blood sample was never tested for alcohol. (*Id.* at p. 1253.)

Three doctors testified in support of a diminished capacity defense. (*In re Sixto, supra*, 48 Cal.3d at p. 1254.) According to Dr. Sanderson (a clinical psychologist and neuropsychologist), Sixto stated that he drank beer and used marijuana at the party, and that someone surreptitiously placed a yellow powder in his beer while he was in the bathroom. Sanderson thought it likely Sixto had an acute psychotic episode triggered by alcohol and/or drug intoxication, and that this caused him to be out of contact with reality and unable to recall the 45 minutes he was gone from the barbecue. (*Ibid.*)

Dr. Thompson (a neurologist-psychiatrist) found evidence of scar tissue on Sixto's brain which predisposed him to an attack of acute pathologic alcoholic intoxication, due to heavy alcohol consumption at the time of the offense. Sixto told Thompson that he drank 20 beers, smoked marijuana, and had PCP placed in his beer without his knowledge. Sixto described how he felt after he drank the PCP-laced beer, and related his memories of events of the evening. He told Thompson that he recalled carrying Jorge to the edge of the vineyard, that he had not wanted to hurt the child, and that he thought it was the powder which made him do it if, in fact, he did it. Thompson believed Sixto had amnesia during the time Jorge was killed, and that it was due to psychomotor epilepsy precipitated by alcohol intoxication. He concluded Sixto did not have the ability to form the specific intent to kill, to premeditate or deliberate, or to harbor malice. (*In re Sixto, supra*, 48 Cal.3d at p. 1254.)

Dr. Blinder (a psychiatrist) opined that Sixto had probably suffered a psychotic episode precipitated by large amounts of alcohol and possibly other drugs. Sixto told Blinder that he drank approximately 24 cans of beer in about 7 hours on the day of the killing, and related his memory of events. Sixto said someone put a yellow powder in his beer. Other people were using the powder. He went to the bathroom, came back, drank his beer, and then felt funny. When Blinder saw a laboratory report showing no evidence of PCP, he eliminated PCP as a cause, but did not change his opinion that Sixto was significantly impaired mentally and could not form intent. (*In re Sixto, supra*, 48 Cal.3d at p. 1255.)

In rebuttal, the prosecution called Dr. Burdick, a psychiatrist. Sixto told him that he started drinking about noon on June 6, and related his ingestion of marijuana and unknowing ingestion of PCP in his beer. Burdick found no evidence of psychosis and no present psychiatric disease. However, during his initial evaluation, he felt that if PCP consumption were substantiated, it might well have contributed to a very significant alteration of Sixto's mental state. The report from Western Laboratories did not substantiate PCP usage. (*In re Sixto, supra,* 48 Cal.3d at p. 1255.)

Dr. Badgley, a psychiatrist, also testified in rebuttal. He found Sixto to be in the normal range mentally and emotionally. (*In re Sixto, supra,* 48 Cal.3d at p. 1255.) Finally, Detective Gutierrez and Deputy Medina also testified in rebuttal. According to Gutierrez, Sixto told him on June 7 that he consumed six or seven beers, and no other drugs, at the party. Medina testified that he asked Sixto about drugs, and Sixto did not mention PCP or marijuana. (*Id.* at p. 1256.)

After deliberation, the jury found Sixto guilty of first degree murder with two felony-murder special circumstances (sodomy and lewd and lascivious conduct), sodomy, and lewd and lascivious conduct with a child. Punishment was ultimately fixed at death.

### 2. Writ Proceedings

In the writ proceedings, the Supreme Court addressed Sixto's claim that Lorenz and Cook were ineffective for failing to (1) have the blood sample tested for alcohol level, (2) investigate PCP usage, and (3) to adequately investigate mitigating evidence.[6] Sixto argued that failure to have the blood sample tested for alcohol completely undermined his diminished capacity defense. The Supreme Court found merit to this contention, and found the omission "particularly inexplicable in light of the fact that the defense theory of diminished capacity relied entirely on alcohol consumption." (*In re Sixto, supra,* 48 Cal.3d at p. 1258.) Significant prejudice resulted, as the prosecutor "relied heavily on the fact that there was no substantiation of [Sixto's] claim that he had drunk a sizable amount of alcohol on the day of the offense." (*Ibid.*)

The problem was exacerbated by the failure of Lorenz or Cook to timely obtain, transcribe, and translate the tape recordings of Sixto's statements to Gutierrez and Medina. By the time this was done, Gutierrez had already testified that Sixto said he consumed in excess of six or seven beers. Neither

---

[6]The latter issue is irrelevant to the instant case, and in fact was not reached by the Supreme Court. (*In re Sixto, supra,* 48 Cal.3d at p. 1264.)

Lorenz nor Cook ever challenged this testimony, even though the translation of the statement showed Sixto actually said he drank " 'much, much more than six or seven beers.' " Moreover, Gutierrez testified on rebuttal, without impeachment, that Sixto said he had " 'consumed six or seven beers during the day.' " (*In re Sixto, supra*, 48 Cal.3d at pp. 1258-1259.)

On this point, the California Supreme Court concluded: "[Sixto] had consistently told the doctors that he had drunk about 20-24 beers. The credibility of these statements was completely undermined by the inaccurate portrayal Gutierrez gave regarding [Sixto's] statement to him about the amount of beer he had consumed. The effect was devastating since the prosecutor used the conflict regarding the amount of beer to suggest that everything else [Sixto] had told the doctors was equally untrue. This in turn called into question the validity of the doctors' opinions since they necessarily depended in large part on the truth of [Sixto's] statements to them." (*In re Sixto, supra*, 48 Cal.3d at p. 1259.)

Evidence was also presented to the Supreme Court concerning testing for PCP. The urine sample obtained by Dr. Linder showed " 'trace positive' for PCP content." (*In re Sixto, supra*, 48 Cal.3d at p. 1259.) Dr. Aniline subsequently tested the blood sample; it " 'indicated a positive PCP peak at the detection limit.' " (*Ibid.*) In Aniline's opinion, this result, together with the result of the urine sample, provided " 'equivocal results of PCP in Sixto's system.' " (*Ibid.*) On August 5, 1982 (after the start of trial), Aniline wrote Lorenz and advised that an acidification test was necessary to determine if trace levels of PCP were still in Sixto's blood or urine. This would assist Aniline in deciding whether Sixto was suffering from diminished capacity at the time of the offense. As Sixto had been continually in custody, Aniline believed it was unlikely Sixto could have obtained PCP during that time. Hence, a positive PCP blood analysis would have indicated to Aniline that a quantity of PCP was in Sixto's system at the time of his arrest. (*Id.* at pp. 1259-1260.) Lorenz never replied to Aniline's letter and no further PCP testing was done. (*Id.* at p. 1260.)

PCP has the unique property of remaining in the human body for many months or years while undetectable in the bloodstream or urine. It may, however, be found by an acidification test. Aniline and Linder both felt Sixto's description of the subjective effects of PCP were consistent with scientific findings on PCP intoxication, and that Sixto's lack of sophistication and education made it unlikely he could have described the symptoms unless he actually experienced them. As a result of the positive test results of the blood and urine samples, Linder believed Sixto was suffering from PCP intoxication at the time of the offense. (*In re Sixto, supra*, 48 Cal.3d at p. 1260.)

Attorney Cook knew the Western Laboratories test of Sixto's blood was negative for PCP. However, he did not become aware of Linder's positive PCP findings until after trial. In fact, during trial, Cook advised Dr. Blinder that he could not discuss PCP in his testimony because of the laboratory report indicating no PCP was found. Had Blinder known of the Aniline-Linder test results, he would have been firmly convinced of his original diagnosis and could have stressed the impact of PCP ingestion. (*In re Sixto*, *supra*, 48 Cal.3d at pp. 1260-1262.) Moreover, Dr. Burdick (who testified for the prosecution in rebuttal) would have answered questions differently regarding the issues of deliberation, malice, intent, and motive had he known of the two positive PCP tests. He probably would have opined that Sixto's ability to do those things was " 'greatly limited if not absent at the time of the offense.' " (*Id.* at p. 1262.) Yet, at defense counsel's request, the trial court did not instruct on involuntary intoxication. Counsel stated that this was a tactical decision, based on the lack of any substantive evidence to support PCP ingestion. (*Ibid.*)

Based on the omissions of both Cook and Lorenz, the California Supreme Court found that the jury at Sixto's first trial: "was never allowed to consider the most plausible explanation for [Sixto's] conduct. The destructive effects of PCP are widely recognized. According to Dr. Linder, PCP can cause 'otherwise law-abiding individuals to commit acts of degradation and violence which are completely out of keeping with their character and which acts are committed without the individual being aware of their actions.' Dr. Burdick had stated in his rebuttal testimony that 'PCP is one of those [drugs] that will predictably cause psychosis in essentially all of us.' " (*In re Sixto*, *supra*, 48 Cal.3d at p. 1262.)

The Supreme Court determined the jury rejected Sixto's story in the absence of any scientific support for his claim that he had drunk 20 beers and had involuntarily ingested PCP. The court concluded that "the jury might well have found [Sixto's] version believable had it been supported by scientific evidence." (*In re Sixto*, *supra*, 48 Cal.3d at p. 1264.)

### 3. *In Limine Motion for Sanctions*

On August 28, 1990, in preparation for Sixto's retrial, defense attorneys Katz and Simrin filed a motion for sanctions based on destruction of the blood sample that was taken from Sixto the morning of his arrest. Counsel asserted that by the time they were appointed, the sample had dried up and was no longer available for testing. Counsel claimed the loss of the sample resulted from various acts of the state or its agents: (1) Gutierrez and Medina misled the defense regarding Sixto's statements about his beer consumption;

(2) the state used an insufficiently equipped laboratory to test for PCP and the laboratory misled the defense to believe there was no PCP in Sixto's blood; (3) the state, through the court acting as its agent, appointed incompetent counsel; and (4) the state, through its agents (the district attorney's office; sheriff's department; and the court) failed to preserve the sample for testing once competent counsel were appointed.

Because the instant crimes occurred before the effective date of Proposition 8, counsel suggested the failure to preserve the blood sample constituted a violation of Sixto's due process rights under *People* v. *Hitch* (1974) 12 Cal.3d 641 [117 Cal.Rptr. 9, 527 P.2d 361]. However, counsel claimed sanctions should be imposed even under the more restrictive standard of *California* v. *Trombetta* (1984) 467 U.S. 479 [81 L.Ed.2d 413, 104 S.Ct. 2528].[7] Pursuant to *People* v. *Zamora* (1980) 28 Cal.3d 88 [167 Cal.Rptr. 573, 615 P.2d 1361], which noted that dismissal is not always an appropriate sanction, counsel declined to ask for dismissal of the charges. Instead, counsel requested the following sanctions:

"(1) A finding that the defendant had a diminished capacity as a result of alcohol and PCP ingestion to form the intent to commit either a lewd act or to kill.

"(2) A finding that the alcohol blood level in the defendant was between .22 to .30 percent at the time of the death of Jorge Garza.

"(3) A finding there was PCP in the defendant's bloodstream at the time of the death of Jorge Garza.

"(4) The prohibition of any testimony suggesting the defendant was not intoxicated at that [*sic*] time of Jorge Garza's death.

"(5) The prohibition of entry into evidence of the negative PCP analysis done by the prosecution and Western Laboratories."

Needless to say, the People opposed the motion. The People asserted, and defense conceded, that the blood sample was sent to Western Laboratories pursuant to Lorenz's motion, with a representative of the district attorney's office transporting the sample. The sample was frozen from the time it was obtained until it was sent to Western Laboratories. The sample was returned

---

[7] Proposition 8 added article I, section 28 to the California Constitution. Subdivision (d) of that section prohibits the exclusion of unlawfully seized evidence, except to the extent exclusion remains federally compelled. (*In re Lance W.* (1985) 37 Cal.3d 873, 886-887 [210 Cal.Rptr. 631, 694 P.2d 744].)

to the Kern County Sheriff's Lab on May 25, 1982. In July or August 1982, the defense sent a portion of the original sample to Dr. Aniline for further testing. Aniline reported, in a letter to Lorenz, that "the blood sample 'gave equivocal results because there was a positive P.C.P. peak but at the detection limit.'" The People claimed "[t]he remainder of the blood sample was marked as People's Exhibit 61 and introduced as an exhibit at trial on July 26, 1982."

The People argued they fulfilled their obligation because the sample was preserved for testing by the defense and such testing was accomplished. They claimed they were under no duty to test for alcohol, and argued they were not responsible for whatever happened to the blood sample after it was introduced into evidence.

The motion was heard on September 17, 1990. There was extensive argument; defense counsel summarized Sixto's position as seeking sanctions in order to give Sixto the benefit of where he would have been but for the "mistakes, incompetence and misrepresentations of State agents." According to counsel, state action deprived Sixto of the benefits of the blood sample. The People countered that evidence of PCP would be introduced at the second trial, and noted Sixto was entitled to a fair trial, not a perfect one. The People argued they were not responsible for the acts of defense counsel or of the court, insofar as the sample was not retained.

The court denied the motion for sanctions. It noted the California Supreme Court found that Lorenz and Cook performed incompetently in this case, not that they were incompetent "across the board." The court found this significant because if the court had appointed "known incompetents," Sixto might be able to argue state action. Such was not the situation here. The court then determined that even under the standard of the early 1980's—*Brady* v. *Maryland* (1963) 373 U.S. 83 [10 L.Ed.2d 215, 83 S.Ct. 1194], as opposed to the later standards of *California* v. *Trombetta, supra,* 467 U.S. 479 and *Arizona* v. *Youngblood* (1988) 488 U.S. 51 [102 L.Ed.2d 281, 109 S.Ct. 333]—it was necessary to consider what the state knew regarding exculpatory evidence. In this regard, the court stated:

"The state preserves the blood sample. The state preserves the actual statement of the defendant. Even under the translation and the gloss, if you would, given the translation by the deputies when they translated in their minds and testified as to what in English, what the defendant had said in Spanish, mentions drinking by the defendant which, of course, would be sufficient to put a competent attorney on notice that there might be a drinking defense.

"We have the request of the defense of analysis of the sample and analysis being accomplished at their request by an independent laboratory; and given all that knowledge on the part of the People that they have made it clear to the defense what the statement of the defendant was, if not by translation, then by the availability of tapes that the blood itself has been made available for analysis, that it was, we know in analyzable form, because it was analyzed by Western Labs, I cannot find any basis for a sanction in this case, even applying the standard of Brady versus Maryland which is much more, more favorable to the defense than the later development of the law in this case."

### 4. Evidence Presented at Second Trial

In the unpublished portion of this opinion, the evidence presented at Sixto's second trial has already been described in detail. Defense evidence concerning intoxication, as well as instructions given and refused, will be briefly recapped here.

Dr. Sanderson, a clinical psychologist and neuropsychologist, testified that based on his interview with, and testing of, Sixto, he concluded Sixto was brain-damaged. Sixto told Sanderson about drinking and smoking marijuana, and that someone put yellow powder in his beer. Sixto believed this happened while he was in the rest room. Although Sixto did not tell Sanderson how many beers he himself drank, Sanderson assumed, in view of Sixto's small stature, that he consumed enough to become intoxicated. Sixto did not know if he killed the boy, because he did not recall.

Sanderson related that at Sixto's first trial, Sanderson testified he thought Sixto had been in an acute psychotic episode as a result of heavy alcohol and/or drug intoxication. When Sixto told Sanderson about the yellow powder having been put into his drink, Sanderson assumed it was PCP. Sanderson believed Sixto had dull normal intellectual functioning and brain damage. He also believed Sixto was under the influence of alcohol and PCP.

Dr. Linder, a psychopharmacologist with research emphasis on PCP, testified that PCP users have certain reactions to the drug. One cannot predict which reaction one will have. Linder compared the situation to Russian roulette; it is unknown what will happen at any given point in time, and the user can rapidly vacillate from one effect to another. Even so, there are some basic characteristics of intoxication that are always evidenced in all users, some of which are subjective and some of which are objective. But reactions to the drug still vary tremendously. While PCP causes effects similar to other drugs, it also causes some unique effects that can be

identified and which separate it from other drugs. In addition, PCP is a dissociative anesthetic, and a very small amount of the substance is capable of causing these changes. PCP is difficult to find in blood because it only remains in the blood in small amounts for brief periods of time. Urine testing is the preferred method of detection.

Linder believed the facts of the instant case were consistent with PCP ingestion and/or intoxication. However, he could not positively state that Sixto ingested PCP on the evening in question.

Dr. Aniline was a psychiatrist who also had a degree in chemistry. Aniline's laboratory tested Sixto's blood sample and found it to be trace positive for PCP. Aniline wrote Lorenz that there were equivocal results because there was a positive PCP peak but at the detection limit. In Aniline's experience, when he found trace levels of PCP that were below one nanogram, a quantity of PCP in the system could be verified by doing acidification. Aniline also had Sixto's urine sample tested. The result was 1.9 nanograms per milliliter. This meant there was PCP in that urine sample. The trace positive results received from the blood sample also meant PCP was present.

The importance of the acidification test was to concentrate the drug in the urine or blood, in order to enhance the tester's ability to determine quantity. The tests that were performed on Sixto's samples showed PCP was present. The issue was how much was present.

Aniline was asked a hypothetical question based on the evidence at trial. In his opinion, the scenario was consistent with Sixto having ingested PCP on the night of June 6.

Clinical psychologist LaCalle also interviewed and tested Sixto. He concluded that on June 6, 1981, Sixto's low intelligence level and documented brain damage were compounded by alcohol intoxication and reported PCP use. LaCalle opined that Sixto was incapable of premediating, deliberating, or forming specific intent.

### 5. *Jury Instructions*

After both sides rested, the trial court instructed, inter alia, on first degree murder based on premeditation and deliberation; first degree felony murder based on commission of a lewd and lascivious act with a child; unpremeditated second degree murder; diminished capacity to form a specific mental state; the relevance of intoxication to specific intent; voluntary manslaughter

based on diminished capacity caused by mental defect, alcohol, or other drug intoxication; and involuntary manslaughter based on lack of intent to kill as a result of diminished capacity caused by mental defect, alcohol, or other drug intoxication. The court refused to instruct on involuntary intoxication; unconsciousness; and involuntary manslaughter based on a killing while unconscious due to voluntary intoxication.[8] In addition to refusing various other special instructions requested by the defense, the court refused defense special instruction "J," which read: "Defendant has presented substantial evidence of alcohol and phencyclidine (PCP) intoxication. Valuable corroborating toxicology tests were not performed on defendant's blood or other body fluids to substantiate the amount of alcohol and verify the amount of phencyclidine (PCP). This was due to the negligence of his prior attorneys. In deciding the guilt or innocence of the defendant, you cannot hold the failure to perform these tests against the defendant now."

In requesting this instruction, defense counsel argued that Sixto had to be compensated at retrial for the errors of Lorenz and Cook. Because of those errors and the subsequent destruction of the blood sample, current counsel claimed they were unable to provide scientific substantiation for Sixto's claim that he consumed a substantial amount of alcohol prior to the offense, or to further corroborate the trace positive results of PCP. Defense counsel were worried jurors would infer tests were performed with results unfavorable to Sixto, or that Sixto was responsible for not providing such crucial evidence. Such inferences, it was argued, would lead to the jury's discounting the entire defense. Defense counsel urged that given the reversal for ineffectiveness of counsel, Sixto should not be placed in the same position as he was in the first trial. At a minimum, counsel contended, the instruction should be given regarding alcohol.

The court observed that had the acidification test been done, it would not have changed the quality of the testimony that was given. The following then occurred:

"THE COURT: What I'm doing is sitting here thinking of what sort of an instruction I might give. I'm not going to give the instruction you proposed.

"
. . . . . . . . . . . . . . . . . . . . . . . . . . . . .

"MRS. GREEN [prosecutor]: . . . [W]e could tailor something . . . , if the Court is inclined to give one—that you heard evidence the Defendant

[8]The court refused to instruct on involuntary intoxication and unconsciousness because no evidence of involuntary intoxication or unconsciousness was admitted for the truth of the matter asserted. However, it modified CALJIC No. 4.21 (voluntary intoxication—when relevant to specific intent) to refer simply to intoxication in general.

ingested alcohol on the night in question or June 6th, whatever, no testing was done, the reason that no testing was done is not something the jury should speculate on and should not be a subject of deliberations, something to that effect.

"THE COURT: That is essentially the sort of thing I'm thinking of doing. But I want—I still want to think a minute about what I would say.

"MR. KATZ: *If that's all we are going to get, your Honor, we'd rather have nothing.*

"THE COURT: Well, let me try to draft something first.

"MR. KATZ: All right.

"THE COURT: This is an instruction which I would be willing to give and I hasten to say I have no pride of authorship and I would be happy to entertain further suggestions as to the wording. But I would give an instruction along these lines: Defendant has presented evidence of alcohol intoxication on the night of June 6th, [1981]. As you are aware, blood drawn from Defendant shortly thereafter was never tested for the presence of alcohol. In your deliberations you are not to speculate as to why neither side analyzed the blood sample for the presence of alcohol nor are you to draw any inferences adverse to either side based upon the fact that no such blood alcohol analysis was accomplished.

" . . . . . . . . . . . . . . . . . . . . . . . . . . .

"MR. KATZ: Your Honor, will [*sic*] all due deference to the Court's preparation and brilliant idea, we would like to withdraw the request.

"THE COURT: Well, you don't want to withdraw. You want me to reject your version.

"MR. KATZ: *We want you to reject.*

"THE COURT: *You do want to ask me not to give the version that I prepared.*

"MR. KATZ: *Yes.*

"THE COURT: I will, however, instruct the People that they are not to make arguments of the type that would normally be appropriate and that is to argue that since the defense had access to the blood sample, they should have analyzed it for alcohol and their failure to do so may leave the jury to draw an inverse [*sic*] inference. I'll instruct you not to do that.

"MRS. GREEN: I won't do that unless they get up there and argue that we should have analyzed it, which is very for common [*sic*] defense attorneys to say what the prosecution didn't do. If they get up there and take that posture, . . . then I think that opens the door to us coming back and saying—

"THE COURT: I agree that I don't think that either side should play with this matter of the failure to analyze. Mr. Simrin.

"MR. SIMRIN: Yes. I think that not only should we, I think that it would be dereliction of our duty if we did not. I think there were so many things that were done—that were not done in this case that should have been done and so many items of evidence that were ignored and obliterated—and this is only one of them—that it's incumbent upon the defense to point out those gaps in the investigation which are now no longer available as the years progress to the defense. I think that it's appropriate for us to point those things out and this is one of them. Particularly in light of the fact that no instructions were ever—were ever given to the people in the field who were collecting these samples with regard to testing of the alcohol. This particularly, in light of the fact that the Defendant told two officers on tape, although Pensinger says he never heard of it, that he had been drinking considerably and that fact was never conveyed to defense counsel. I think that we should be permitted to raise the question of whether or not they did these things.

"Now I'm perfectly prepared to concede that counsel is right, if I raise it she has the right to respond to it. I have no quarrel with that. But I should not be barred from raising it.

"THE COURT: And you will note, Mr. Simrin, that I told the People they should not address it and I suggested that you might not want to raise it because I agree that the defense has wide latitude. But I also agree with your analysis as an experienced litigator and officer of the courts, that obviously if you argue in that fashion on rebuttal, she will not be constrained from argument.

"MR. SIMRIN: I have no problem with this.

"THE COURT: She'll not address it in her opening argument and she can address it in her rebuttal." (Italics added.)

In his argument to the jury, Simrin presented what he saw as the failure of the prosecutorial team to conduct a thorough investigation of Jorge's death.

While this perceived failure was not limited to the lack of testing of the blood sample, at one point Simrin stated:

"There was no alcohol testing. And we have told—we have been told that alcohol testing could be done up to six to eight months with some degree of accuracy. And I want to tell you, that's not entirely the fault of the prosecution. Okay. They share a blame in it. But it's the incompetent lawyers the first time around also share a blame in it. But aside from the blame, it's not here for us to test. That's the key question, he hasn't got it to test."

In her closing argument, the prosecutor concentrated on the defense experts and the results of the tests that were performed. She termed the failure of the prosecutorial team to test the blood for alcohol a "red herring" and claimed it was a nonissue:

"In other words, because why would any of the officers run it for alcohol if there was nothing about the defendant which made them think that he was under the influence of alcohol, as well as the defendant's own statements suggesting he wasn't drunk to the point that he didn't know what was going on, as well as defendant's own attorneys initially not running a sample for alcohol."

As previously noted, Sixto was found guilty as charged and the special circumstances were found to be true. One of the grounds upon which Sixto subsequently moved for a new trial was the court's failure to give special instruction "J." The motion for new trial was denied.

## C. *Discussion*

### 1. *Preliminary Observations*

It has often been said that a criminal defendant is entitled to a fair trial, not a perfect one. (E.g., *Schneble* v. *Florida* (1972) 405 U.S. 427, 432 [31 L.Ed.2d 340, 345-346, 92 S.Ct. 1056]; *People* v. *Morris* (1991) 53 Cal.3d 152, 187 [279 Cal.Rptr. 720, 807 P.2d 949]; *People* v. *Hamilton* (1988) 46 Cal.3d 123, 156 [247 Cal.Rptr. 31, 753 P.2d 1109].) The question on appeal is therefore not whether, under different circumstances, Sixto might have been able to present a defense which may have been more persuasive to the jury. Instead, the question is whether, given the procedural posture of this case and the trial court's refusal to impose sanctions or curative measures, Sixto received a fair trial. We answer in the affirmative and conclude he is not entitled to reversal of his convictions.

As we discuss this issue, several points must be kept in mind. First, when it vacated Sixto's convictions, the California Supreme Court was aware the blood sample was no longer available for testing. In discussing the failure to conduct testing for alcohol, the court stated: "Unfortunately, the blood sample no longer exists." (*In re Sixto, supra*, 48 Cal.3d at p. 1258.)

This knowledge is significant because it means the reversal and remand were *not*, as Sixto contends in his reply brief, "to permit the appropriate testing and evidentiary presentation to occur." The Supreme Court was fully aware the testing could *not* occur. Yet at no time did the court suggest this would deprive Sixto of a fair retrial. Instead, the court stated: ". . . The test results from Dr. Linder and Dr. Aniline would certainly have bolstered [Sixto's] credibility and the opinions of the doctors which were based on it. *In the absence of any objective evidence* supporting [Sixto's] PCP story, the prosecution was able to decimate it. Trial counsel's inadequate preparation left [Sixto] and his experts vulnerable to prosecutorial challenge regarding both the alcohol and PCP intoxication claims. Counsel should have been ready to challenge Detective Gutierrez's characterization of [Sixto's] statement about the number of beers he had drunk. They should also have obtained a blood-alcohol test. They should have followed through on the recommended additional PCP testing, and they should have presented the PCP test results that were obtained." (*In re Sixto, supra*, 48 Cal.3d at p. 1265, italics added.)

During the retrial, defense counsel presented evidence of PCP ingestion and alcohol intoxication which was *not* presented in the first trial. Obviously, counsel could not obtain a blood-alcohol test, nor could they obtain further PCP testing. However, the Supreme Court said nothing which suggests it felt inability to determine blood-alcohol content or further PCP testing would deprive Sixto of a fair retrial. Nor does its opinion imply that it sought to limit the trial court's determination of what, if any, curative measures were necessary or appropriate upon retrial.

Second, it is important to keep in mind that in the second trial, no evidence of *involuntary* PCP ingestion was admitted for the truth of the matter asserted. All such evidence consisted of Sixto's statements to various doctors, and the jury was properly limited in its consideration of this evidence. The record shows defense counsel were well aware of this fact. While Sixto now appears to suggest the trial court somehow erred in instructing the jury on the limited purpose of this evidence, defense counsel also requested limiting instructions concerning Sixto's statements to the doctors. The reason is obvious: Sixto admitted at least once that he killed Jorge. In any event, Sixto cites no authority in support of the implied

proposition that the trial court erred. Sixto was able to present evidence of PCP ingestion based on the testing of his blood that did occur; as the trial court noted, at least insofar as the specific intent crimes were concerned, the *effect* of the alleged intoxication was the same, whether it was voluntary or involuntary.

Third, it is questionable whether the blood sample could have been accurately tested for alcohol content even if it had been refrigerated after the first trial. The Supreme Court merely noted that a declaration by V. Parker Bell "establish[ed] that [Sixto's] blood-alcohol level at the time of the offense could have been estimated if the blood sample taken on June 7 had been tested for alcohol level." (*In re Sixto, supra,* 48 Cal.3d at p. 1258.) It is not clear whether Bell was referring to testing prior to trial or to testing at a later date had the sample been refrigerated. There is no clear showing that had the sample been refrigerated, it could have been accurately tested once competent counsel entered the case. This point is relevant to the issue of whether the People should have been sanctioned for failure to refrigerate the blood sample.

Fourth, there appears to have been some confusion about the nature of the additional PCP tests which might have been performed. The blood sample *was* tested for PCP—first by Western Laboratories and then by Dr. Aniline. Aniline recommended an acidification test. As far as the record before this court and the California Supreme Court opinion in *Sixto* show, the acidification test was the only additional PCP test that remained.

The acidification test was *not* a test of the existing blood sample. Under direct examination by defense counsel, Dr. Linder explained that PCP adheres to the fat tissue of the body, and that it can sometimes be detected in urine two to three years after ingestion. When asked how to get the PCP released from the fat tissue, Linder stated that the body becomes more acidic under stress or exercise, and the subject can be given ammonium chloride or ascorbic acid (vitamin C) for two or three days to increase the amount of PCP being excreted. The PCP precipitates into the urine, where it can be detected. Linder testified that this test is called acidification. Similarly, Dr. Aniline explained acidification in terms of giving the subject an acidic material. This allows the PCP to collect or concentrate in blood or urine, and gives the tester more material to isolate and with which to work.

■ It is obvious from the foregoing that acidification was to be performed on Sixto, not on the existing blood sample. Even assuming the People failed to preserve the blood sample, they certainly did not fail to "preserve" Sixto. Thus, by no stretch of the imagination could sanctions be imposed on the People because the acidification test was not performed.

■ Finally, for the first time, at oral argument, Sixto suggested that sanctions or curative measures are automatically required in any case in which reversal occurs because of counsel's deficient investigation of a defense. Nothing we say here should be read as to so imply. In determining what, if any, obligation the trial court bears on retrial where deficient performance by original counsel has made it impossible for the defendant to present certain evidence, each case must be judged upon its own facts. To hold otherwise would in many cases unjustly place the defendant in a better position than he or she would have held had counsel competently performed. Carried to the extreme, such a holding could make the defendant judgment-proof: if defense counsel's ineffectiveness in the investigatory stage led to retrial counsel's inability to present certain evidence, the trial court would be required to instruct the jury to presume the evidence would have been favorable to the defendant. This might or might not be an unjustified result. It is not entirely inconceivable that this might even lead to purposefully substandard investigation.

In the case at bench, despite the shortcomings of Lorenz and Cook, retrial counsel were able to bring out significant evidence which was not presented at the first trial. Thus, the second trial was not rendered a meaningless, futile replay of the first proceedings, even absent some sort of curative measures by the trial court.

### 2. *Sanctions*

■ As previously discussed, Sixto requested that the trial court impose a variety of sanctions for what he termed "destruction" of the blood sample. The court found no basis for imposing sanctions and denied the motion.

■ The California Supreme Court recently summarized the law applicable to such a motion: "In [*People* v. *Hitch*, *supra*, 12 Cal.3d 641], we held the People violate a criminal defendant's right to federal due process if they fail to adequately preserve evidence in their possession when there exists a 'reasonable possibility' the evidence would have been material and favorable to the defendant. To redress the constitutional violation, the results of the test could be excluded. (*People* v. *Moore* (1983) 34 Cal.3d 215, 223-224 [193 Cal.Rptr. 404, 666 P.2d 419].)

"After we decided *Hitch*, the United States Supreme Court addressed the same due process issue and formulated a different test. Contrary to our decision in *Hitch*, the high court opined that in order to gain relief, a defendant must show the 'evidence . . . possess[ed] an exculpatory value that was apparent before the evidence was destroyed, and . . . [was] of such

a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means.' (*California* v. *Trombetta* (1984) 467 U.S. 479, 489 [hereafter *Trombetta*].) *Trombetta* supersedes *Hitch* (*People* v. *Douglas* (1990) 50 Cal.3d 468, 512-530), and applies even to cases—like the present one—where the crime occurred prior to the enactment of the so-called 'Truth-in-Evidence' provision of our state Constitution. (Cal. Const., art. I, § 28, subd. (d); see, e.g., [*People* v. *Johnson* (1989) 47 Cal.3d 1194,] 1234 [*Trombetta* applies in 1980 case].)" (*People* v. *Hardy* (1992) 2 Cal.4th 86, 165, parallel citations omitted.)

Application of *Trombetta* defeats Sixto's claim. Even assuming the court itself was under some duty to preserve the blood sample, given the evidence adduced at the first trial, it simply cannot reasonably be said the sample possessed an exculpatory value that was apparent before it was destroyed. (Cf. *California* v. *Trombetta, supra,* 467 U.S. at p. 489 [81 L.Ed.2d at p. 422]; *People* v. *Hardy, supra,* 2 Cal.4th at p. 165.) The defense had been given access to the sample for testing. Nothing in the California Supreme Court's opinion in *Sixto* or in the record of the instant appeal suggests the original trial court should have been on notice defense counsel were incompetent. Nor is there anything to suggest the court should have somehow divined, in the absence of test results being offered into evidence, that the blood sample might provide support for Sixto's diminished capacity/ intoxication defenses.

"The constitutional duty to preserve favorable evidence . . . is not violated when the authorities have no reasonable basis to believe that the materials destroyed will have bearing on a criminal defense." (*People* v. *Melton* (1988) 44 Cal.3d 713, 750 [244 Cal.Rptr. 867, 750 P.2d 741].) Such is the situation here. The trial court had no reason to think the blood sample might be exculpatory; nor was the prosecution—whose witnesses saw no signs of intoxication in Sixto at the time of his arrest and which had made the sample available to the defense for testing—required to anticipate reversal of the conviction and the possibility the sample might prove important in the future.

Under these circumstances, no due process violation occurred and the trial court properly denied the motion for sanctions. (*California* v. *Trombetta, supra,* 467 U.S. at pp. 488-489 [81 L.Ed.2d at pp. 421-422]; *People* v. *Huston* (1989) 210 Cal.App.3d 192, 214 [258 Cal.Rptr. 393].)[9] That the evidence may have been "of such a nature that the defendant [was] unable to obtain comparable evidence by other reasonably available means"

---

[9]In *Arizona* v. *Youngblood, supra,* 488 U.S. 51, the United States Supreme Court modified the *Trombetta* test and held that "unless a criminal defendant can show bad faith on the part

(*Trombetta, supra,* at p. 489 [81 L.Ed.2d at p. 422]) is immaterial: *Trombetta*'s two-prong test of materiality is in the conjunctive not the disjunctive, and both prongs must be met before an item can be classified as " 'constitutionally material' " (*People* v. *Von Villas* (1992) 10 Cal.App.4th 201, 241 [13 Cal.Rptr.2d 62]). As the California Supreme Court has stated in response to the argument that at a minimum, the trial court should have given a favorable jury instruction under *People* v. *Zamora, supra,* 28 Cal.3d 88: "Although an adverse instruction may be a proper response to a due process violation [citation], there was no such violation in this case. The trial court was not required to impose *any* sanction, including jury instructions. [Citations.]

"The trial court's refusal to sanction the prosecution did not leave defendant helpless. . . . [H]e was entitled to take his 'best shot' before the jury, and present evidence regarding deficiencies in the investigation to try to discredit the case against him. 'This was adequate to insure a fair hearing and was itself a sufficient sanction.' [Citation.] The '*Hitch*' motions were properly denied." (*People* v. *Cooper, supra,* 53 Cal.3d at pp. 811-812, parallel citations omitted.)

### 3. *Curative Measures*

 Given the unusual circumstances of this case, it is appropriate to move beyond the issue of sanctions—which imply punishment of some sort—and determine whether the trial court should have adopted Sixto's proposals as curative measures for the ineffectiveness of original counsel. In short, should such measures have been adopted under general principles of due process, and was Sixto denied his right to a fair trial by their omission?[10]

 Criminal defendants are guaranteed a fair trial by the due process clause of the Fourteenth Amendment of the United States Constitution. (*Crane* v. *Kentucky* (1986) 476 U.S. 683, 690 [90 L.Ed.2d 636, 644-645, 106 S.Ct. 2142]; *Strickland* v. *Washington* (1984) 466 U.S. 668, 684-685 [80 L.Ed.2d 674, 691-692, 104 S.Ct. 2052].) "[D]ue process demands whatever is necessary for fundamental fairness." (*People* v. *Marshall* (1990) 50 Cal.3d

---

of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." (488 U.S. at p. 58 [102 L.Ed.2d at pp. 289-290].) *Sixto has failed to make such a showing.* Logic suggests that if *Trombetta* applies to pre-Proposition 8 cases, so does *Youngblood.* (See *People* v. *Cooper* (1991) 53 Cal.3d 771, 811 [281 Cal.Rptr. 90, 809 P.2d 865]; *People* v. *Johnson* (1989) 47 Cal.3d 1194, 1234 [255 Cal.Rptr. 569, 767 P.2d 1047].) This need not be determined, since Sixto's claim fails under *Trombetta.* (Cf. *People* v. *Hardy, supra,* 2 Cal.4th at p. 166, fn. 18.)

[10]We will assume, for the sake of argument, that the trial court was asked to consider the requests contained in Sixto's motion for sanctions as both sanctions and general curative measures.

907, 925 [269 Cal.Rptr. 269, 790 P.2d 676]; cf. *Lassiter* v. *Department of Social Services* (1981) 452 U.S. 18, 24 [68 L.Ed.2d 640, 647-648, 101 S.Ct. 2153].) Essential to procedural fairness is the opportunity to be heard. (*Crane* v. *Kentucky, supra*, 476 U.S. at p. 690 [90 L.Ed.2d at pp. 644-645].) Thus, "the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.' [Citations.]" (*Ibid.*) As the United States Supreme Court has stated, "Due process guarantees that a criminal defendant will be treated with 'that fundamental fairness essential to the very concept of justice. In order to declare a denial of it we must find that the absence of that fairness fatally infected the trial; the acts complained of must be of such quality as necessarily prevents a fair trial.' [Citation.]" (*United States* v. *Valenzuela-Bernal* (1982) 458 U.S. 858, 872 [73 L.Ed.2d 1193, 1205-1206, 102 S.Ct. 3440].)

██ It is settled that trial courts "enjoy a large measure of discretion in determining the appropriate sanction that should be imposed" because of the failure to preserve or destruction of material evidence. (*People* v. *Zamora, supra*, 28 Cal.3d at p. 99; cf. *People* v. *Medina* (1990) 51 Cal.3d 870, 894 [274 Cal.Rptr. 849, 799 P.2d 1282].) ██ The same standard should apply where, as here, there has been no sanctionable failure to preserve, but the defendant claims particular admonitions or other measures are necessary to assure him a fair trial.

In determining whether the trial court should have adopted any of Sixto's proposals, *Zamora* is instructive. *Zamora* teaches that even in cases involving the destruction of discoverable evidence, " '[t]he remedies to be applied need be only those required to assure the defendant a fair trial.' [Citations.]" (*People* v. *Zamora, supra*, 28 Cal.3d at p. 99, fn. omitted.) This is no less true where, as here, the problem arose because of the incompetence of original counsel. By analogy to *Zamora*, factors to be considered in determining whether a particular proposal should have been adopted include the circumstances of the loss or destruction of the evidence and the materiality of the evidence suppressed. (*Id.* at p. 100.)

As previously noted, Sixto first requested a finding (presumably in the form of a jury instruction) to the effect that he "had a diminished capacity as a result of alcohol and PCP ingestion to form the intent to commit either a lewd act or to kill." This went well beyond anything necessary to assure Sixto a fair trial.[11] Even assuming blood-alcohol and acidification tests had been performed and the results were favorable to Sixto, a finding of diminished capacity would not have been a foregone conclusion. Given the

---

[11]As the trial court aptly observed at one point during trial: "I don't read Sixto, I am referring to that found in 48 Cal 3rd, as indicating Mr. Sixto is to be put in a better position than if he had not had incompetent counsel."

People's evidence, including the officers' observations at the time of arrest and footprint and other physical evidence which suggested Sixto attempted to avoid detection, the issue of diminished capacity would have remained a disputed factual question for the jury to determine. (See *People* v. *Poddar* (1974) 10 Cal.3d 750, 759 [111 Cal.Rptr. 910, 518 P.2d 342].) While the requested instruction might have been appropriate if, for instance, the People had destroyed the blood sample in bad faith, it was certainly not essential to a fair trial. Accordingly, the trial court did not err in failing to adopt it as a curative measure.

Sixto next requested a finding that his blood-alcohol level "was between .22 to .30 percent at the time of the death of Jorge Garza." Again, a jury instruction to that effect was not necessary in order for Sixto to receive a fair trial. Evidence was presented concerning the amount of beer Sixto consumed on the day in question. Criminalist Gregory Laskowski testified that if a 110-pound man stopped drinking at 8:30 p.m., he would have to have drunk 7 beers in order for there to be a measurable amount of alcohol in his bloodstream at 11:30 the next morning. If he had drunk seven beers, his blood-alcohol level at 8:30 (i.e., when he stopped drinking) would have been approximately .23 to .24 percent. If he drank more than the seven beers, his blood-alcohol level would have risen proportionately. Dr. Badgley, the People's rebuttal expert, concluded Sixto was intoxicated.

Moreover, in her argument to the jury, the prosecutor expressly conceded Sixto had been drinking and was intoxicated; however, she argued the evidence did not show he was intoxicated to the point where he could not form specific intent, or that he did not know what he was doing. Defense counsel commented on Laskowski's calculations, and noted that the legal driving limit for alcohol in California is .08. Counsel also discussed the combined effect of alcohol, PCP, and brain damage on Sixto's ability to form specific intent. No evidence was presented to suggest that a particular level of blood alcohol corresponded to a quantifiable diminution in the ability to form specific intent or any other mental state that the prosecution was required to prove, and no offer of proof was made that such evidence could be presented. Under these circumstances, an exact blood-alcohol level would not have sufficiently changed the strength of Sixto's defense so that its absence denied him a fair trial.

Another finding proposed by the defense was that "there was PCP in the defendant's bloodstream at the time of the death of Jorge Garza." This was also unnecessary to a fair trial: Sixto was able to present expert testimony concerning the results of the blood sample with regard to PCP content, as

well as various witnesses' conclusions—implicit in their answers to hypothetical questions—that he had PCP in his system at the time of the offense. Had the acidification test been done, and had it provided stronger evidence of PCP ingestion, it still would not have prevented the prosecutor from arguing Sixto obtained the drug while in jail. (At trial, testimony was elicited that it was possible for an inmate to obtain drugs while in jail.) Nor would it have indicated whether Sixto was under the influence of PCP at the time he killed Jorge.

Sixto next proposed the prohibition of any testimony suggesting he was not intoxicated at the time of Jorge's death. To the extent he meant any evidence suggesting he was not so intoxicated that he could not form a specific intent or did not know what he was doing, such a measure would have been purely punitive in nature and unwarranted under the circumstances of this case. To the extent he meant anything less, the instruction was unnecessary because the prosecutor conceded he was intoxicated.

Sixto also requested the "prohibition of entry into evidence of the negative PCP analysis done by the prosecution and Western Laboratories." First, this analysis was done at the request of defense counsel Lorenz, not the prosecution. Second, given Dr. Aniline's results, the evidence merely led to a battle of experts. This did not violate due process or deny Sixto a fair trial.

Finally, Sixto requested that the trial court give special instruction "J." As previously discussed, that instruction read:

"Defendant has presented substantial evidence of alcohol and phencyclidine (PCP) intoxication. Valuable corroborating toxicology tests were not performed on defendant's blood or other body fluids to substantiate the amount of alcohol and verify the amount of phencyclidine (PCP). This was due to the negligence of his prior attorneys. In deciding the guilt or innocence of the defendant, you cannot hold the failure to perform these tests against the defendant now."

The trial court properly refused to give this instruction. Whether evidence of intoxication was "substantial" was a question for the jury to decide. Moreover, whether PCP was present in Sixto's system was open to debate, given the conflicting test results.

In addition, the instruction permitted—perhaps even invited—the jury to hold the failure to perform the tests against the prosecution. It was, of

course, permissible for defense counsel to argue that the authorities should have done more and that the investigation was so flawed, there was a reasonable doubt about Sixto's guilt. But argument is one thing. This instruction would have come from the court and would have implied the court found the investigation deficient. ██ As stated in *People* v. *Gonzales* (1989) 209 Cal.App.3d 1228, 1234 [257 Cal.Rptr. 828], "A trial court should not give instructions which are argumentative or which call upon the jury to accept specific evidence concerning which there is a factual dispute. If a judge does comment on the evidence, ' "such comment should in the interests of justice, not be limited within an area selected by the defendant, nor given in the language of his [or her] choosing." ' " (Citations omitted.)

██ Here, the trial court properly offered to give a nonargumentative, neutral instruction which would have prevented the jury from inferring that Sixto was somehow responsible for the defense's failure to substantiate the intoxication claims, or that in fact tests were performed and the results were unfavorable to the defense. The court also offered to preclude argument on the subject. Defense counsel rejected the court's proposals. This decision appears to have been a reasonable tactical choice: counsel felt it important to argue the perceived flaws in the investigation in support of the claim it was not proved beyond a reasonable doubt that Sixto was the perpetrator. However, once the trial court offered a neutral instruction, it was not required to do more.

In summary, no sanctions were warranted, as failure to preserve the blood sample did not constitute a due process violation. Although Sixto was not prevented from presenting a strong case for diminished capacity, he did not present specific evidence of the effects alcohol and/or PCP might have on the user. For example, Dr. Linder testified:

"There are responses that users will get by using this drug [PCP] that go across the range of effects that most drugs can cause people to experience.

"And the inconsistent element is that you are not sure which one you are going to get. It's a matter of kind of a Russian Roulette situation in that you don't know what is going to happen at any given point in time; and the user can vacillate very rapidly from one effect to the other, although *there are some basic characteristics of intoxication that are always evident in all users*, some of which are subjective and some of which are objective, and those are very steadfast and observable on the part of the clinician in determining whether that person is under the influence of PCP.

" . . . . . . . . . . . . . . . . . . . . . . . . .

"But what I am trying to indicate is that PCP causes almost all of the effects that other drugs can cause either collectively or intermittently; and that is the unique part about this drug is it's a dissociative anesthetic; and a very small amount of the substance is capable of causing these changes." (Italics added.)

Dr. Linder never explained to the jury just what basic characteristics of intoxication are always evident, or what changes PCP can cause. Subsequently, although he testified that alcohol increases the effect of PCP, he again did not describe what that effect is likely to be. Similarly, Dr. Aniline testified:

"[Q. (by Mr. Katz)] . . . You said your lab was set up because you could not find the information in your clinical setting. What do you mean by that?

"A. Well, we would have people that were hospitalized or come in to psychiatry particularly where the clinical picture, *the symptoms, behaviors, were very reminiscent of someone intoxicated or having been exposed to PCP.* . . .

"Q. Let me stop you there. You're saying that someone would come in with PCP symptoms and you would take a body fluid sample and could not find PCP?

" . . . . . . . . . . . . . . . . . . . . . . . . .

"A. We would send that routinely to the clinical laboratory. The clinical laboratory would send back a result and say not detected or not there. We didn't buy that because *we knew either from the person telling us things or from their symptoms* that it should be there." (Italics added.) Like Dr. Linder, Dr. Aniline never explained what symptoms or behaviors suggested PCP use.

It may be that alcohol and/or PCP have such a wide range of effects that neither expert could testify with more exactness. It is also possible defense counsel chose not to elicit more specific testimony because the expected symptoms or effects would not have corresponded with Sixto's behavior on

June 6. But under the circumstances, knowing the amount of alcohol and/or PCP in Sixto's system would not have significantly bolstered his defense.[12]

Quantification of the blood-alcohol level or PCP would not have changed the type or quality of the defense to such an extent that its absence, or the lack of curative measures, rendered the trial unfair.

II.-VIII.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . .

### DISPOSITION

The judgment is affirmed.

Ardaiz, Acting P. J., and Thaxter, J., concurred.

Appellant's petition for review by the Supreme Court was denied October 21, 1993.

---

[12]In *People* v. *Frierson* (1979) 25 Cal.3d 142 [158 Cal.Rptr. 281, 599 P.2d 587], the California Supreme Court noted that the mere showing of consumption of alcohol or drugs is not even sufficient to warrant an instruction on diminished capacity. (*Id.* at p. 156.) The court commented that on the facts of the case before it, "in the absence of evidence regarding the amount of drugs ingested by defendant *and their effect upon his mental state*, no reasonable juror would have concluded that defendant lacked a specific intent . . . ." (*Id.* at pp. 156-157, italics added.) We do not suggest the trial court here need not have instructed on diminished capacity, but merely offer this as an observation on the strength of Sixto's defense.

*See footnote, *ante*, page 374.