Filed 6/2/16  P. v. Read CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

|  |  |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>TONY READ,<br><br>    Defendant and Appellant.<br><br>———<br><br>In re TONY READ,<br><br>    on Habeas Corpus. | A143253<br><br>(Humboldt County<br> Super. Ct. No. CR1305988)<br><br><br>A146123 |

This is a consolidated direct appeal from judgment and petition for writ of habeas corpus (habeas petition) brought by defendant Tony Read.  The issues raised on direct appeal and by way of the habeas petition are essentially the same, and thus may be considered collectively herein:  (1) whether defendant was irreparably harmed by the prosecutor's failure to disclose and retain information relating to the victim's identification of a third party as the perpetrator of the crime in a pretrial photo lineup, and by the prosecution's subsequent remark in closing argument that this unidentified third party had "nothing to do" with the crime; and (2) whether defendant's trial attorney violated his constitutional right to effective assistance from counsel by, among other things, failing to object to this purportedly improper prosecutorial argument and to direct the trial court to on-point legal authority.  We affirm the judgment and summarily dismiss the petition for writ of habeas corpus.

1

**FACTUAL AND PROCEDURAL BACKGROUND**

On March 18, 2014, a first amended information was filed in Humboldt County charging defendant with the following crimes: carjacking (Pen. Code, § 215, subd. (a)) (count one), and (2) assault with a firearm (Pen. Code, § 245, subd. (a)(2) (count two)).[1] In addition, the information alleged with respect to count one that defendant personally used a firearm within the meaning of section 12022.53, subdivision (b), section 1192.7, subdivision (c)(8), and section 667.5, subdivision (c)(8).

A jury trial began March 18, 2014. However, after several days of testimony, on March 26, 2014, defense counsel moved for dismissal or, alternatively, a mistrial after discovering the prosecution had failed to timely produce evidence that the victim had identified someone other than defendant as the perpetrator of the crime during a photo lineup that took place on September 29, 2013. Specifically, defense counsel made this discovery on March 25, 2014, when he requested a copy of the actual photo lineup from the prosecution in order to prepare for cross-examination of the officer that administered the lineup procedure. After hearing from both counsel, the trial court ordered a mistrial under the authority of *Brady v. Maryland* (1963) 373 U.S. 83 (*Brady*) with defense counsel's consent. In doing so, the trial court found that the untimely discovery had indeed occurred, but was not "so egregious that it requires dismissal."[2] The court also granted a continuance to allow the defense to "obtain further information regarding the photo lineup and its composition and related issues."

On June 13, 2014, prior to the second trial, defense counsel filed another motion for dismissal or mistrial under *Brady*, arguing defendant's case had been irreparably harmed by the prosecution's continued failure to turn over a copy of a police document containing both the photo lineup itself, as well as information regarding the identity and location of the suspect identified by the victim as the perpetrator of the crime. According

---

[1]    Unless otherwise stated, all statutory citations herein are to the Penal Code.

[2]    The trial court denied defendant' motion for dismissal without prejudice "so that these issues can be further litigated."

to the prosecution, this document, referred to as the "key sheet," had been inadvertently lost or destroyed by the police department.

On July 30, 2014, the trial court denied the defense's second motion, reasoning that the prosecution had produced all the information regarding the photo lineup to the defense prior to the second trial with the exception of the key sheet. As such, the trial court concluded no further relief was warranted because the appropriate remedy under *Brady* – to wit, a new trial – had already been provided. Thus, on August 26, 2014, a second trial began, at which the following evidence was presented.

In the afternoon of September 27, 2013, Kevin Chapman (hereinafter, the victim) drove a friend to the Blue Lake Casino near Eureka. At about 6:00 p.m., after dropping his friend off, the victim stopped at a nearby gas station to use the restroom. On his way out, a young man approached him and requested a ride to McKinleyville. The victim acquiesced, and the man got into the front passenger seat, telling the victim his two friends (a male and a female) were still inside the store. Once the man's friends left the store, they likewise got into the back seat of the victim's car and requested a ride to McKinleyville. When the victim responded that he was driving to Arcata, they asked to be dropped off at the "off-ramp right there," and the man in the front seat offered to pay $10 for the ride.

The victim proceeded to drive toward Arcata, making a brief stop along the way. As the victim took the exit at McKinleyville, he noticed the front-seat passenger appeared "kind of nervous." Shortly thereafter, the man placed a pistol at the victim's head and told him to "get the fuck out of the car." The victim attempted to grab the pistol to push it away from his head, but the man in the backseat behind him put him in a chokehold. Meanwhile, the man and woman in the backseat began punching the victim in the back of his head. As a result of this struggle, the pistol fired a round inside the car, causing the victim to let go of the gun. The front-seat passenger began to "pistol-whip" the victim over his head about three times. In response, the victim put his car in park, and told them: "Take everything. It's not worth getting killed over. Take the car." He then "flopped" out of the car and ran to some nearby bushes to hide. After waiting for the

3

three individuals to leave in his car, the victim flagged down a motorist and the police were called. An ambulance eventually transported the victim to a nearby hospital, where he was treated with staples to the three lacerations to his head.

Del Norte Deputy Sheriff Richard Griffin subsequently located the victim's car outside of the residence at 369 Butte Street in Crescent City. When Deputy Griffin advised the resident, Judith Watson (defendant's mother), that this car was stolen and asked whether she had any information, she responded: "Yea, they're all inside." Upon entering the residence, officers located Watson's husband, Ernest, as well as Romeo Glaze and Jennifer Steinoff. Shortly thereafter, while searching the residence, officers located defendant hiding in the laundry room between the wall and a washing machine with the keys to the victim's car in his left-front pocket.

Officers later searched the victim's car and found the following: a loaded firearm inside a holster in the driver's side door with a few shells missing and some expended rounds; a cardboard box on the rear passenger seat containing 23 .22-caliber live bullets; another box on the rear window ledge with a tax refund check issued to "Tony Read" by the State of South Carolina; a metal fragment consistent with a bullet fragment on the driver's floorboard; and damage to the left-hand side of the dashboard vent consistent with bullet entry.

When police interviewed defendant, he acknowledged getting a ride to McKinleyville from "a guy at the Blue Lake Gas Station." Defendant further acknowledged that, during this ride, he was seated in the front passenger seat. He insisted, however, the driver had dropped him off at "Sonny Bono's house," where he was later picked up. After being jailed, defendant made several phone calls in which he expressed worry that "they [are] probably telling on me."

At trial, Ernest and Judith Watson testified that, on the day in question, they had seen defendant and "another young man and a girl" near the river in the same car that was later found outside their residence.

Humboldt County Sheriff's Investigator Todd Fulton, in turn, testified that he presented the victim with a photo lineup on or about September 30, 2013 and, although

4

defendant's photograph was included in the lineup card, the victim did not identify him as the person who pistol-whipped him on the day in question.

Further, Deputy Sheriff Gregory Berry testified that he met with the victim on or about September 29, 2013 to show him a photo lineup. During this procedure, the victim identified the suspect in the fifth position (hereinafter, Suspect No. 5) on the lineup card as "the guy who pulled the pistol on me and hit me in the head." Defendant's photograph was not included on this lineup card.

In closing argument, defense counsel thereafter argued to the jury that the victim's identification of a third party as a perpetrator of the crime gave rise to a reasonable doubt as to defendant's guilt. The prosecutor, in turn, argued that the third party identified by the victim "could be somebody from Sacramento for all we know. He had nothing to do with this case."

On September 5, 2014, the jury found defendant guilty as charged and found true the allegation of personal use of a firearm with respect to the carjacking count. On October 3, 2014, following a hearing, the trial court denied probation and sentenced defendant to state prison for a total term of 19 years. This appeal and habeas petition followed.

## DISCUSSION

Defendant raises the following arguments for our consideration. Defendant contends his constitutional right to due process was violated by the prosecution's failure to disclose and to retain information relating to the victim's identification in a photo lineup of someone other than him. Defendant further contends the prejudice from these failures was exacerbated by the prosecutor's improper remark in closing argument that this individual, who was never identified, had "nothing to do with this case." Additionally, defendant contends in his habeas petition that his constitutional right to effective assistance from counsel was violated by his trial attorney's failure to cite key legal authority when moving for dismissal in the trial court, to thoroughly investigate the facts relating to the prosecution's suppression of evidence, and to make a timely and

5

appropriate objection to the aforementioned improper remark by the prosecutor in the trial court. We address each argument in turn below.

## I.     Failure to Disclose and Retain Exculpatory Evidence.

Defendant's initial claim is that the trial court erred by denying his motion to dismiss this case based on the prosecutor's failure to properly disclose and retain key exculpatory evidence that someone other than him may have committed the charged crime. Specifically, defendant claims as constitutional error the prosecution's failure to, first, disclose and, later, to prevent the loss of, information that the victim identified someone other than him as the perpetrator of the crime in a pretrial photo lineup. This information was reflected in the following four documents: (1) the photo lineup card; (2) the victim's handwritten statement identifying Suspect No. 5 (to wit, not defendant) on the photo lineup card as the perpetrator; (3) a separate photo lineup card, referred to as the "key sheet," that included the name and residence of each of the suspects on the card; and (4) a police narrative report prepared by the officer that conducted the lineup procedure. By defendant's own account, the prosecution had, prior to the start of the second trial, produced each of these documents with the exception of the "key sheet," which the prosecution acknowledged had gone missing from police records due to inadvertence or mistake within the police department.

In arguing these circumstances require dismissal of this case, defendant relies upon the constitutional principles set forth in three cases: *Brady*, *California v. Trombetta* (1984) 467 U.S. 479 , 488-489 (*Trombetta*), and *Arizona v. Youngblood* (1988) 488 U.S. 51, 56 (*Youngblood*). Based upon this authority, defendant reasons that, where, as here, exculpatory evidence subject to disclosure under *Brady* has been destroyed or otherwise lost such that the defendant has "no way to effectively utilize the information provided by the evidence, the proper remedy is dismissal. (*People v. Alvarez* (2014) 229 Cal.App.4th 761, 778-779)." The relevant law is as follows.[3]

---

[3]      As the People note, below, defendant relied upon only *Brady* when moving for dismissal of the charges against him. As such, the People contend defendant has waived the right to challenge his conviction on appeal under *Trombetta* and *Youngblood*. We,

6

Under *Brady*, "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." (373 U.S. at p. 87.) "The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish "materiality" in the constitutional sense." [Citation.]' [Citations.]" (*People v. Superior Court* (*Meraz*) (2008) 163 Cal.App.4th 28, 52 (*Meraz*).) "As we have described it in terms of posttrial analysis of nondisclosure, ' "[m]ateriality . . . requires more than a showing that the suppressed evidence would have been admissible [citation], that the absence of the suppressed evidence made conviction 'more likely' [citation], or that using the suppressed evidence to discredit a witness's testimony 'might have changed the outcome of the trial' [citation]. A defendant instead 'must show a "reasonable probability of a different result." ' [Citation.]' [Citation.]" (*Meraz, supra*, 163 Cal.App.4th at p. 52.) Further, in this context, the "requisite 'reasonable probability' is a probability sufficient to 'undermine[] confidence in the outcome' on the part of the reviewing court." (*In re Sassounian* (1995) 9 Cal.4th 535, 544.) "Although the term '*Brady* violation' is often broadly used to refer to any failure on the part of the prosecution to disclose favorable information to the defense, a true violation occurs only if three components coexist: 'The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued.' (*Strickler v. Greene* (1999) 527 U.S. 263, 281-282 . . . .)" (*People v. Uribe* (2008) 162 Cal.App.4th 1457, 1474.)

however, agree with defendant that the gist of his argument in seeking dismissal was made clear to the trial court, notwithstanding the failure of defense counsel to cite the aforementioned cases. As such, we decline to find defendant has forfeited the right to review of this issue on appeal and, instead, proceed to the merits. We further note that our conclusion in this regard disposes of any need to address defendant's ancillary argument that his trial attorney failed to provide effective legal assistance by failing to directly cite *Youngblood* or *Trombetta* below.

7

Also relevant in this case is a related set of principles that likewise implicates a criminal defendant's due process rights: "Closely related to the *Brady* rule requiring the prosecution to *disclose* material evidence favorable to the defense is the prosecution's obligation to *retain* evidence. With respect to retention, however, the prosecution's obligation is narrower. Its failure to retain evidence violates due process only when that evidence 'might be expected to play a significant role in the suspect's defense,' and has 'exculpatory value [that is] apparent before [it is] destroyed.' (*California v. Trombetta* (1984) 467 U.S. 479 , 488-489 [81 L.Ed.2d 413, 104 S.Ct. 2528].) In that regard, the mere 'possibility' that information in the prosecution's possession may ultimately prove exculpatory 'is not enough to satisfy the standard of constitutional materiality.' (*Arizona v. Youngblood* (1988) 488 U.S. 51, 56 [109 S.Ct. 333, 336, 102 L.Ed.2d 281].) And whereas under *Brady, supra*, 373 U.S. 83, the good or bad faith of the prosecution is irrelevant when it fails to *disclose* to the defendant material exculpatory evidence (*id.* [373 U.S.] at p. 87 [83 S.Ct. at pp. 1196-1197]), a different standard applies when the prosecution fails to *retain* evidence that is potentially useful to the defense. In the latter situation, there is no due process violation unless the accused can show bad faith by the government. (*Arizona v. Youngblood, supra,* 488 U.S. at p. 58 [109 S.Ct. at pp. 337-338].)" (*City of Los Angeles v. Superior Court* (2002) 29 Cal.4th 1, 8.)

Relying on these principles here, defendant contends, first, that the missing photo lineup evidence is "manifestly exculpatory, not merely 'potentially' so" within the meaning of *Trombetta*/*Youngblood*; and second, that, in the absence of any "good faith" explanation for the prosecution's failure to preserve this evidence, dismissal is the appropriate remedy. We disagree with both contentions.

First, as to the nature of the missing evidence, we reject defendant's claim that it is manifestly exculpatory. Indeed, this is not a case where all information on the subject of third-party culpability was lost. Rather, after a five-plus month delay between the first and second trials, the prosecution produced – and the jury heard – a plethora of evidence and argument relating to the victim's identification of Suspect No. 5 (and non-identification of defendant) on the photo lineup card. In particular, defense counsel

8

presented to the jury a copy of the lineup card with the photograph of Suspect No. 5. In addition, defense counsel presented evidence that the victim was quite adamant in his statement to police that the perpetrator of the crime was Suspect No. 5 on the lineup card, and not any of the other suspects. Defense counsel then cross-examined the officers who prepared and presented the photo lineup to the victim regarding the one piece of information that was missing – to wit, the name of the suspect and County in which he resided. Finally, defense counsel emphatically advised the jury in closing argument about the significance of this missing evidence, including the fact that defendant was precluded from finding and questioning Suspect No. 5 to determine whether he was in fact the perpetrator. These circumstances belie defendant's claim that, due to the prosecution's failure to retain the key sheet, he was left "with no way to effectively utilize the information provided by the evidence."

Further, as the People explain, the photo lineup card was randomly derived from a search of a computer database created and maintained by the California Department of Justice. This database contains information and photographs of individuals collected from several state and county sources, including the California Department of Motor Vehicles and the California prison system. As Officer Todd Fulton, the Sheriff's Department investigator who prepared the lineup card, testified:

"A. It's a computer program within the computer itself. . . . [W]e present [defendant's] photograph, and then the computer itself would pick up through its search images that resemble him. [¶] So there's kind of a random selection of people that are of that same ethnic group, facial hairs, body styles. It's to eliminate having a guy with a red shirt with five other guys in blue shirts.

"Q. So the pictures of each individual should kind of resemble each other?

"A. That's correct.

"Q. And, if I may, that's specifically to make it so it's not suggestive? You're not suggesting any one individual over the other?

"A. That's correct."

As this testimony reflects, the exculpatory value of the missing information identifying Suspect No. 5 was far from manifest. To the contrary, Suspect No. 5, like all suspects on the photo lineup card aside from defendant, was randomly selected in a computerized search of a statewide criminal justice system database, making the exculpatory value of his identifying information, at best, uncertain. As a result, we conclude defendant has failed to make the requisite showing under *Trombetta* and *Youngblood* that the missing evidence possessed such exculpatory value that it would have been apparent to the prosecution at the time of the evidence's disappearance or destruction. (*Youngblood, supra,* 488 U.S.at p. 56 [the mere possibility that information in the prosecution's possession may ultimately prove exculpatory "is not enough to satisfy the standard of constitutional materiality"].)

Further, even assuming for the sake of argument the missing evidence could be deemed manifestly exculpatory, we reject defendant's insistence that the prosecution's failure to retain it was in bad faith, such that dismissal of all charges should be ordered. "Bad faith" in this context means "malice" or acting with the "design to seek an unconscionable advantage over the defendant." (*People v. Coles* (2005) 134 Cal.App.4th 1049, 1055.) Or, as explained in *Youngblood*, the existence of bad faith by a police officer for purposes of the Due Process Clause "must necessarily turn on the police's knowledge of the exculpatory value of the evidence at the time it was lost or destroyed." (*Youngblood, supra*, 488 U.S. at p. 56.) Yet in our case, defendant, in essence, reasons the District Attorney's Office must have acted in bad faith, to wit, intentionally failing to retain the key sheet with knowledge of its exculpatory value, because, according to defendant, there is no evidence they acted in good faith. Specifically, defendant argues the prosecution's explanation for the missing evidence – that police inadvertently lost it – was inadequate. In addition, defendant relies upon on a posttrial declaration submitted by his trial attorney, stating that, in the attorney's opinion and based upon his professional experience in Humboldt County courts, someone in the District Attorney's Office must have deliberately removed the key sheet from the case file and destroyed it. We conclude

10

defendant's showing in this regard fails to establish bad faith, particularly in light of other relevant evidence in the record, which defendant mostly disregards.

In particular, the record, much of which has already been set forth, reflects the following: Deputy Sheriff Gregory Berry, the officer who presented the lineup card to the victim, testified that he had no memory of having seen the key sheet in this case; Deputy Scott Aponte, the officer who helped prepare the lineup documents, testified similarly that he had no idea what happened to the key sheet; Officer Fulton testified that the photo lineups used by Humboldt County were randomly generated from the aforementioned California Department of Justice database, which contains "[t]housands to millions" of potential lineup photos; and defendant's trial counsel attested in his posttrial declaration that he personally believed someone in the District Attorney's office deliberately removed and destroyed the key sheet (a belief he did not disclose earlier for fear of personal and professional harassment and retaliation). Having considered the totality of this evidence, we conclude defendant has failed to meet his burden to prove bad faith. First, with respect to the attorney declaration, defense counsel ultimately offers no more than his own personal belief that misconduct occurred. In the absence of any actual facts as to who, what, when or how this purported misconduct by the District Attorney's Office occurred, we find counsel's opinion to be speculative. Further, while defendant insists the "selective destruction" of key exculpatory evidence by the prosecution could only mean bad faith, the record, reasonably read, does not support his claim. Quite simply, there is a missing document, and the individuals who did or should have handled the document do not know why it is missing. These circumstances, while unfortunate, are not necessarily uncommon in the investigative realm. In any event, whatever the frequency of such an occurrence, we decline defendant's invitation to assume from these facts alone that something sinister occurred, notwithstanding his attorney's contrary personal opinion.

Accordingly, we reject defendant's due process challenge. Whether considered under the *Brady* or *Trombetta*/*Youngblood* standards, defendant's challenge fails given the absence of any manifest exculpatory value of the missing evidence, and the absence

11

of any proof of bad faith by the prosecution in handling it. (*Trombetta, supra*, 467 U.S. at pp. 488-489 [if the suppressed evidence is only potentially useful, there is no due process violation absent bad faith]; *People v. Sixto* (1993) 17 Cal.App.4th 374, 397-398 & fn. 9 [in the absence of a showing by defendant that the police acted in bad faith, failure to preserve potentially useful evidence does not amount to a denial of due process].) While we sympathize with defendant's frustration at the untimely disclosure of this evidence of possible third-party culpability, as well as the subsequent inability to produce the lineup key card, the law is clear that criminal defendants have no right to a perfect trial, but simply a fair one. (*People v. Sixto, supra*, 17 Cal.App.4th at p. 393.) Here, we conclude the trial court took appropriate steps to remedy this unfortunate situation by declaring a mistrial in defendant's first trial, and then providing the defense ample time to complete appropriate discovery and investigation of relevant facts prior to his second trial. No more was required under the given circumstances. (*People v. Wright* (1985) 39 Cal.3d 576, 591 [" 'Not every suppression of evidence requires dismissal of charges . . . . The remedies to be applied need be only those required to assure the defendant a fair trial' "]; § 1054.5, subd. (c) ["court shall not dismiss a charge [for the prosecution's failure to disclose] unless required to do so by the Constitution"].)

And finally, we simply note with respect to defendant's claim of irreparable harm, we agree the *Chapman v. California* (1967) 386 U.S. 18 (*Chapman*) test would apply to any constitutional error under *Brady* or *Trombetta*/*Youngblood*. However, even assuming for the sake of argument such error occurred, we would not find reversible error on this record. Defendant was seen by witnesses driving the victim's car with the other two suspects following the carjacking. Police later found defendant hiding behind the washing machine in his parent's house with the keys to the victim's car in his pocket. Inside the victim's car was, among other things (including live ammunition), a tax refund check from the State of South Carolina made out to defendant. And, once in jail, defendant expressed concern that others were "telling on" him in recorded phone conversations.

Defendant insists this evidence may have sufficed to support a conviction for receiving stolen property, but did not suffice to support his conviction for felony kidnapping and robbery. But, in so arguing, defendant ignores his own admission that, on the day in question, he not only received a ride in the victim's car, he sat in the front seat next to the victim – to wit, the same seat occupied by the person who pistol-whipped the victim. To this record, we hasten to add the fact, already discussed at length above, that the exculpatory value of the missing evidence was, at best, ambiguous. Under these circumstances, we are left to conclude that any error regarding the prosecution's failure to preserve or prevent destruction of the key sheet from the photo lineup must be deemed harmless beyond a reasonable doubt. (See *People v. Wright, supra*, 39 Cal.3d at p. 591 [concluding that, in light of the remedial procedure used by the trial court to address the prosecution's suppression of evidence, any error was harmless beyond a reasonable doubt].)

## II.    Ineffective Assistance from Counsel.

In a separate (but related) claim, defendant insists that, had his trial attorney worked more diligently to investigate what happened to the missing key sheet, or to cross-examine individuals in the District Attorney's Office with access to or information about it, the harm to his case engendered by the missing document would have been reduced. Accordingly, he seeks reversal on the ground of having received ineffective assistance from counsel. (See *In re Jackson* (1992) 3 Cal.4th 578, 601 [to prevail on a claim of ineffective legal assistance, defendant must show both deficient performance and that, but for such deficiency, a reasonable probability exists that defendant would have achieved a more favorable result] overruled on another ground in *In re Sassounian, supra,* 9 Cal.4th at p. 545, fn. 6.) However, for essentially the same reasons we have already rejected defendant's due process claims, we likewise reject his ineffective assistance claim.

To briefly rehash the relevant facts, there is not only a wealth of evidence linking defendant directly to these crimes, but undisputed evidence that the suspects on the missing key sheet were mere random selections. Pulled from a centralized Statewide

13

computer database by a search engine based upon physical characteristics shared with defendant, the individuals in the key card photographs were chosen for wholly superficial reasons rather than for any reason suggestive of their possible involvement in these crimes. As such, there is no basis for this court to conclude that any failure by defendant's trial attorney to more thoroughly investigate Suspect No. 5, the individual identified by the victim as the perpetrator, caused defendant undue prejudice in this case. While perhaps more could have been done by counsel on this front, the likelihood that it would have resulted in a better outcome for defendant in this case is indeed minimal. As stated above, "a criminal defendant is entitled to a fair trial, not a perfect one." (*People v. Sixto, supra*, 17 Cal.App.4th at p. 393.)

Accordingly, defendant's claim of ineffective assistance from counsel must be rejected given the lack of any reasonable probability that he would have achieved a more favorable result had his attorney conducted a more thorough investigation of the facts surrounding the missing document. (*Strickland v. Washington* (1984) 466 U.S. 668, 687, 693 [to warrant reversal for ineffective assistance, counsel's errors must be "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable"]; see also *People v. Kipp* (1998) 18 Cal.4th 349, 366 ["if "a defendant has failed to show that the challenged actions of counsel were prejudicial, a reviewing court may reject the claim on that ground without determining whether counsel's performance was deficient"].)

## III. Prosecutorial Misconduct.

And finally, turning to defendant's claim that the prosecutor made an improper comment to the jury to the effect that Suspect No. 5, the person identified by the victim as the perpetrator of the crime, was irrelevant to the case, the applicable law is clear. "A prosecutor's conduct violates the Fourteenth Amendment to the federal Constitution when it infects the trial with such unfairness as to make the conviction a denial of due process. Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves the use of deceptive or reprehensible methods to attempt to persuade either the trial court or the jury." (*People v. Morales* (2001) 25 Cal.4th 34, 44 (*Morales*). See also *People v. Samayoa*

14

(1997) 15 Cal.4th 795, 841 [federal Constitution violated where prosecutorial misconduct is "so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process"].)  When the alleged prosecutorial misconduct stems from the prosecutor's remarks or comments made before the jury, "the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion."  (*Morales, supra,* 25 Cal.4th at p. 44.)

Assuming the claim was properly preserved, the question becomes whether the prosecutorial misconduct was prejudicial, that is, whether it is reasonably probable a result more favorable to the defendant would have occurred if the prosecutor had refrained from the misconduct.[4]  (*People v. Haskett* (1982) 30 Cal.3d 841, 866.)  Prosecutorial misconduct requires reversal under federal law unless the misconduct was harmless beyond a reasonable doubt.  (*People v. Cook* (2006) 39 Cal.4th 566, 608.)

Here, defendant acknowledges his counsel did not properly preserve his claim of prosecutorial misconduct by failing to make a timely objection in the trial court.  In his habeas petition, defendant challenges his trial attorney's failure in this regard as ineffective assistance in violation of his constitutional right to counsel.  Putting aside the issue of forfeiture, however, we conclude defendant's claim lacks merit.

To summarize what has already been discussed at length, defendant contends the prosecutor's statement that Suspect No. 5 "had nothing to do" with this case was a misstatement of fact because, in actuality, the prosecutor had no way of knowing this person's involvement or noninvolvement in the crime.  However, as the People point out, the prosecutor, when he made this purported misstatement, also explained to the jury that Suspect No. 5 was a person "randomly pulled out of a Cal photo generator" by police for use in the photo lineup.  This line of argument accurately reflects the testimony of Officer

---

4     To preserve a claim of prosecutorial misconduct for appeal, the defendant is generally required to make a timely objection at trial, as well as a "request[] that the jury be admonished to disregard the perceived impropriety." (*People v. Thornton* (2007) 41 Cal.4th 391, 454; see *People v. Hill* (1998) 17 Cal.4th 800, 820-821 [counsel's failure to timely object or to request a curative admonition may be excused if such action by counsel would have been futile].)

Todd Fulton regarding the California Justice System database, set forth above. (See p. 9, *ante*.) Defendant does not contend otherwise. Thus, considered in proper context, the prosecutor's argument was reasonable. Given that Suspect No. 5 was indeed randomly included in the photo lineup in this case, even assuming the defense had been able to identify and locate him, it would be pure speculation to suggest this person was in any way involved in this crime. As such, we conclude the prosecutor's statement did not amount to prosecutorial misconduct under California law.[5] (*People v. Welch* (1999) 20 Cal.4th 701, 752-753 [" ' "[t]he prosecution has broad discretion to state its views as to what the evidence shows and what inferences may be drawn therefrom" ' . . . and . . . 'may "vigorously argue his case" . . ., "[using] appropriate epithets warranted by the evidence" ' "]; *People v. Hill* (1998) 17 Cal.4th 800, 819 [prosecutors are "not limited to 'Chesterfieldian politeness' " and may " 'use appropriate epithets' "].) Accordingly, defendant's final challenge fails and the judgment stands.

## DISPOSITION

The judgment is affirmed and the petition for writ of habeas corpus is summarily dismissed. No order to show cause shall issue.

/ / /

/ / /

/ / /

_____
Jenkins, J.

We concur:

_____

_____

[5] Our conclusion in this regard likewise disposes of defendant's claim that his trial attorney's failure to object on prosecutorial misconduct grounds violated his right to effective assistant from counsel.

16

McGuiness, P. J.

_____

Siggins, J.

*People v. Tony Read,* A143253; and *In re Tony Read on H/C,* A146123